[Cite as *State v. Nesser*, 2014-Ohio-1978.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :                C.A. CASE NO.    2013 CA 21

v.                                               :                T.C. NO.    12CR359

ROBERT L. NESSER                                 :                (Criminal appeal from
                                                                  Common Pleas Court)

    Defendant-Appellant                      :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____9th____ day of ____May____, 2014.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, Springfield, Ohio 45501
    Attorney for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 131 N. Ludlow Street, Suite 630, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

    **{¶ 1}**    Robert L. Nesser was found guilty after a jury trial in the Clark

County Court of Common Pleas of three counts of domestic violence (Counts One, Seven, and Sixteen), three counts of felonious assault in violation of R.C. 2903.11(A)(1) (Counts Four, Five, and Nineteen), three counts of felonious assault in violation of R.C. 2903.11(A)(2) (Counts Two, Six, and Eight), four counts of kidnapping (Counts Three, Eleven, Twelve, and Fifteen), three counts of rape in violation of R.C. 2907.02(A)(2) (Count Ten, Seventeen, and Eighteen), one count of rape in violation of R.C. 2907.02(A)(1)(c) (Count Nine), and one count of robbery (Count Fourteen). Nesser was acquitted of one count of aggravated robbery (Count Thirteen). The trial court merged Count Nineteen into Count Five for sentencing and imposed an aggregate sentence of 65 years in prison.

{¶ 2} Nesser appeals from his conviction, raising five assignments of error. He claims that he was brought to trial in violation of his right to a speedy trial, that all of his domestic violence convictions and two of his rape convictions were based on insufficient evidence and were against the manifest weight of the evidence, that several offenses should have merged as allied offenses of similar import, and that the trial court abused its discretion and imposed a vindictive sentence when it sentenced him to 65 years in prison.

{¶ 3} For the following reasons, the trial court's judgment will be affirmed.

**I. Factual and Procedural History**

{¶ 4} The charges against Nesser arose primarily from allegations that on May 10 and May 11, 2012, Nesser repeatedly restrained, assaulted, and raped his

then-girlfriend, T.Y., at multiple locations in Springfield, Ohio.

{¶ 5} According to the State's evidence at trial, T.Y. met Nesser in Easton, Pennsylvania, in January 2012, where Nesser was temporarily residing due to a work-related assignment. When Nesser returned to Springfield in the spring of 2012, T.Y. came with him. The two lived with Nesser's friends on Maiden Lane. In April 2012, T.Y. went to a women's shelter due to domestic abuse by Nesser, and she returned to Easton. Nesser came to Easton and threatened T.Y.; T.Y. returned to Springfield with Nesser. They did not have a permanent address, but instead stayed on Maiden Lane or in an abandoned house next to that residence.

{¶ 6} According to T.Y., on May 10, 2012, Nesser returned from work and accused her of having sex with someone else at the Maiden Lane house. Nesser punched the man that was in the house. He also grabbed T.Y. by the hair, pulled her across the room, punched her "over and over again," and put his arm around T.Y.'s neck in a "sleeper hold" until T.Y. passed out. T.Y. stated that she was not allowed to leave the room or to go to the bathroom without Nesser's following her.

{¶ 7} At some point, Nesser left T.Y. alone on the porch, and T.Y. walked to the nearby Marathon gas station. Nesser followed her and struck her over the head three times with a 40-ounce beer bottle. A woman at the gas station threatened to call the police, and Nesser went around the building. An employee at the Marathon gas station testified that T.Y. came into the gas station with "severe bruises all over." T.Y. asked her to call the police, which the employee did. As T.Y. waited for the police, Nesser came into the gas station, took T.Y. by the hand, and walked her out of the store.

{¶ 8} Nesser and T.Y. went back to Maiden Lane. Nesser continued to hit and punch T.Y. T.Y. returned to the gas station, and the same employee again called the police for her. The employee noticed that T.Y.'s bruising had gotten worse. T.Y. waited in the store for a while, and then a couple at the gas station took T.Y. to Interfaith Hospitality, a women's shelter.

{¶ 9} Officer Kyle Shaffer met T.Y. at Interfaith Hospitality and observed that T.Y. had bruises all over her face and body. Officer Shaffer contacted Officer Zachary Hook and asked him to take photographs of T.Y. Hook photographed bruises on T.Y.'s face, neck, and arms. Officer Shaffer called Project Women, a shelter for abused women, and tried to find a place for T.Y. to stay, but Project Women had no room available. Interfaith Hospitality also did not have room. Shaffer advised T.Y. to hide from Nesser. After the officers left, T.Y. headed back toward Maiden Lane, because it was "the only place [she] knew anyone."

{¶ 10} When T.Y. was a few blocks from Maiden Lane, Nesser approached her and took her to an abandoned house, which was later determined by police to be on Broadway, one side of a duplex. Once inside the house, Nesser shoved T.Y. against a wall, repeatedly punched her and placed her in a sleeper hold; T.Y. testified that she passed out numerous times. Nesser also threatened T.Y. and called her names, whipped her with a belt approximately 25 times, and pulled her along the floor with the belt. Between periods of unconsciousness, T.Y. was aware of Nesser's removing her pants and she experienced rectal pain, which she had not previously had. T.Y. stated that, due to repeated blows to her head, she had difficultly hearing out of her left ear and seeing out of her right eye.

{¶ 11}    Nesser and T.Y. went down into the basement of the Broadway house.  Nesser pushed T.Y. off of the last step and held her down.  T.Y. testified that Nesser put his fingers into her vagina and tried to penetrate her vagina and anus (presumably with his penis); T.Y. did not know if Nesser succeeded in penetrating her because he "choked me out again."  Nesser repeatedly tried to latch the belt around T.Y.'s neck.  Nesser then tried to hang himself with the belt, but the belt broke.

{¶ 12}    T.Y. crawled up the stairs from the basement.  When she reached the top, Nesser "put [her] on the floor" and again choked her until she passed out.  When she regained consciousness, Nesser beat her with a piece of wood framing.  Nesser then started hitting himself with the wood framing and appeared to pass out.  However, Nesser started talking with T.Y., and the two smoked cigarettes.  T.Y. got dressed, and they went back to Maiden Lane.

{¶ 13}    At the Maiden Lane house, Nesser instructed T.Y. to call her mother, say that she (T.Y.) is coming home, and ask her mother to send $150 for a bus ticket by MoneyGram to CVS.  Nesser and T.Y. got a ride from a "drug dealer and his girlfriend" to CVS, where T.Y. got the money and gave it to Nesser.  Nesser and T.Y. went to the drug dealer's home and then returned to Maiden Lane, where Nesser drank and smoked cocaine.

{¶ 14}    Nesser and T.Y. attempted to get a room at the Executive Inn, but were told there were no rooms available.  Later that evening, a room became available, and they checked in under T.Y.'s name.  While there, Nesser tried to have sex with T.Y. while she took a shower; when T.Y. pushed him away and said no, Nesser pushed her down.  Nesser took T.Y. from the bathroom, threw her onto the bed, penetrated her

vagina with his fingers and penis, and penetrated her anally. Nesser punched her in the head while raping her and choked her until she became unconscious.

{¶ 15} The next morning (May 11), Nesser and T.Y. walked toward Maiden Lane. On the way, a police car drove by and stopped them. Nesser was arrested on an outstanding warrant; T.Y. walked back to Maiden Lane.

{¶ 16} Later that day, James VanHoose, who sometimes stayed at the Maiden Lane house, took T.Y. to the home of his girlfriend, Mary Keeton, because T.Y. "had no place else to go." VanHoose noticed that T.Y. was "all bruised up" and behaving nervously. Keeton described T.Y. as "nervous", "shaky", "crying" and "scared." Keeton saw that T.Y. had a black eye, bruises all over her face, a large bruise around her neck, bruises "up and down" her arms, and bruises and welts on her back. T.Y. was "moaning and groaning" and complained of pain and soreness. Keeton suggested that T.Y. go to the hospital and call the police. T.Y. ate and showered at Keeton's home, but did not call the police or seek medical attention that night. The following day (May 12), T.Y. agreed to go the hospital.

{¶ 17} T.Y. was seen at Springfield Regional Medical Center by Dr. Charles Russell and a sex assault nurse examiner (SANE), Amanda Herald, R.N. T.Y. informed Herald about what had occurred, including that she was repeatedly kicked, punched, dragged, beaten with a belt, choked, and raped anally and vaginally. Herald noticed that T.Y. had significant facial bruising and multiple bruising on her arms, legs, and chest. T.Y.'s right upper tooth had been knocked out and her right lower tooth was chipped. T.Y. had bruising to the mons of her pubic area and tissues around her clitoris, as well as

redness around the area. There was "diffuse erythema" (great amount of redness) to the vaginal walls. There were no tears to the vaginal and rectal areas. In addition to extensive bruising all over T.Y.'s body, Dr. Russell also indicated that T.Y.'s left eardrum was ruptured and she had a scalp hematoma. A "rape kit" was completed at the hospital. A vaginal swab taken from T.Y. later revealed sperm cells with Nesser's DNA.

{¶ 18} T.Y. was interviewed at the hospital by Officer Greg Garman and Detective Sandra Fent. Fent took photographs of T.Y.'s injuries. The officers located the Broadway house based on T.Y.'s directions to and description of the property, and they found items that corroborated T.Y.'s version of events.

{¶ 19} Nesser offered several witnesses on his behalf. Angela Sherrock testified that she had a physical confrontation with T.Y. on May 5, 2012, during which Sherrock hit T.Y. at least twice. Nesser's mother testified that she had sent money to Nesser and T.Y. via MoneyGram on several occasions. A man who had lived at the Maiden Lane house for 23 years testified that Nesser stayed at the house "off and on," but he did not recall meeting T.Y. A Rite Aid store manager testified that the Rite Aid across from the hospital handles Western Union money orders.

{¶ 20} On May 21, 2012, Nesser was indicted on multiple counts of domestic violence, felonious assault, kidnapping, rape, aggravated robbery, and robbery. He was arrested on these charges the following day.

{¶ 21} On June 28, 2012, Nesser's counsel moved to withdraw due to a conflict of interest. The trial court granted the motion on July 17, 2012, and appointed

new counsel the same day. The following day, counsel moved to compel discovery from the State, noting that the State had not provided the complainant's criminal history and had failed to provide a portion of the complainant's medical records.

{¶ 22} On July 25, 2012, Nesser filed three motions with the court. First, he moved to continue the trial date, indicating that the State had provided substantial discovery but additional discovery had not yet been provided. Second, Nesser filed a motion to suppress the results of any DNA testing in the case, in the event that DNA evidence is available. Third, he moved to withdraw his plea of not guilty and to enter a plea of not guilty by reason of insanity. At the same time, Nesser filed a waiver of his speedy trial rights "from the date of the motions until the Court can reset the matter."

{¶ 23} Because of Nesser's not guilty by reason of insanity plea, on August 1, 2012, the trial court ordered a competency evaluation. Also on August 1, Nesser filed a motion to allow a court-appointed expert to assist in the interpretation of DNA results. On August 10, Nesser filed a discovery request, asking the State to produce scientific materials pertaining to the DNA testing performed in this case.

{¶ 24} Nesser was evaluated at the Forensic Psychiatry Center on August 14 and August 21, 2012. A competency review hearing was held on September 25, 2012, at which time the trial court presumably determined that Nesser was competent to stand trial. On October 4, 2012, the trial court scheduled the trial for November 6, 2012. On October 29, 2012, the trial court filed an order to convey T.Y. from the Northampton County Prison in Easton, Pennsylvania, where she was incarcerated, no later than November 2, 2012.

{¶ 25}    On November 1, 2012, the State moved for a continuance, stating that it has been unable to reach anyone at the Northampton County Prison to confirm that T.Y. would be transferred to the Springfield Police Department detectives, who were to travel to the prison to bring T.Y. to Springfield for Nesser's trial.  The State had been advised that, due to Superstorm Sandy, the prison was running on generators since October 31, and that the prison and several other government entities were closed due to power loss.    The State had not been "able to speak to a single person and only reached voicemail; none of the messages left by the State [had] been returned."    The State indicated that it could not send detectives to Easton without assurances from the prison that T.Y. would be released.   On November 2, 2012, the trial court found the State's request to be reasonable and reset the trial for January 7, 2013, the first available date on the court's docket.

{¶ 26}    Beginning on January 7, 2013, Nesser was tried before a jury.   The jury acquitted him of aggravated robbery, but found him guilty on all other counts.   The trial court subsequently imposed an aggregate 65-year sentence.

## II.   Speedy Trial

{¶ 27}    In his first assignment of error, Nesser claims that "the trial court's decision to continue the jury trial from November 6, 2013 until January 7, 2013 resulted in a violation of Mr. Nesser's constitutional right to a speedy trial."

{¶ 28}     The right to a speedy trial is guaranteed by the United States and Ohio Constitutions.  *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989).  Ohio's speedy trial statute, R.C. 2945.71, "was implemented to incorporate the constitutional protection of the right to a speedy trial" provided in the United States and

Ohio Constitutions. *Brecksville v. Cook*, 75 Ohio St.3d 53, 55, 661 N.E.2d 706 (1996). As such, that statute must be strictly construed against the State. *Id*.

**{¶ 29}** A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged. *State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-4549, ¶ 15. "If the defendant can make this showing, the burden shifts to the State to establish that some exception[s] applied to toll the time and to make the trial timely. If the State does not meet its burden, the defendant must be discharged. R.C. 2945.73." *Id.*

**{¶ 30}** Under R.C. 2945.71(C)(2), the State must bring a felony defendant to trial within 270 days of arrest. "'Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three, pursuant to the triple-count provision of R.C. 2945.71(E).' This 'triple-count' provision would reduce to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial." (Citation omitted.) *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.).

**{¶ 31}** The time within which a defendant must be brought to trial may be extended for the reasons specifically enumerated in R.C. 2945.72. *State v. Brewer*, 2d Dist. Montgomery Nos. 22159, 22160, 2008-Ohio-2715, ¶ 37, citing *State v. Palmer*, 84 Ohio St.3d 103, 702 N.E.2d 72 (1998). Permissible reasons for extending the trial date include "[a]ny period of delay necessitated by reason of a * * * motion * * * made or instituted by the accused" and "[t]he period of any continuance granted on the accused's

own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"   R.C. 2945.72(E) and (H).

{¶ 32}      Nesser was arrested on the instant charges on May 22, 2012; his speedy trial time began the following day.   *State v. Stewart*, 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 16 ("When computing speedy trial time, the day of arrest is not counted.").   No motions were filed in Nesser's case until June 28, 2012, when Nesser's original counsel moved to withdraw.   At that juncture, 37 calendar days had elapsed.   Nesser's speedy trial time was tolled from the filing of his counsel's motion on June 28 until the trial court granted the motion and appointed new counsel on July 17.

{¶ 33}      On July 18, 2012, Nesser moved to compel disclosure by the State. The motion acknowledged that the State had provided "a substantial amount of discovery" on July 16, but it asserted that certain records, such as T.Y.'s drug screening and her criminal record, were not included.   Although this motion was brought by the defendant, any delay caused by a motion to compel discovery is not chargeable to Nesser when the motion is occasioned by the State's failure to fully comply with his earlier discovery request.   *See State v. Walker*, 8th Dist. Cuyahoga No. 99239, 2013-Ohio-3522, ¶ 24.

{¶ 34}      On July 25, 2012, Nesser filed several motions, including a motion to suppress evidence, to continue the trial date, and to withdraw his plea and enter a plea of not guilty by reason of insanity.   Contemporaneously with his motions, Nesser filed a waiver of his speedy trial rights.   Nesser acknowledged that he was "waiving the time from the date of the motions until the Court can reset the matter."   On October 4, 2012,

the trial date was reset to November 6, 2012. Accordingly, eight additional calendar days elapsed between July 18 and July 25, 2012, when Nesser filed his motions, and the speedy trial time was tolled from July 25 to November 6, 2012.

{¶ 35} On November 1, 2012, the State moved for a continuance on the ground that Superstorm Sandy had interfered with its ability to retrieve T.Y from the Northampton County Prison, where she was incarcerated. The trial court granted the motion on November 2, 2012, within the speedy trial time. The unavailability of a necessary witness may be reasonable grounds for a continuance. *See, e.g., State v. Saffell*, 35 Ohio St.3d 90, 518 N.E.2d 934 (1988); *State v. Rivera*, 11th Dist. Ashtabula No. 2011-A-0023, 2011-Ohio-6854, ¶ 43. The trial court reset the trial for January 7, 2013, the first available trial date. Given the apparent conditions at the Northampton County Prison in the wake of Superstorm Sandy, the trial court did not act unreasonably in granting the State's motion for a continuance and resetting Nesser's trial to January 7, 2013.

{¶ 36} Nesser was brought to trial beginning on January 7, 2013. In light of his motions and the reasonable continuance granted to the State, Nesser's trial began within the allotted speedy trial limits. Nesser's first assignment of error is overruled.

### III. Rapes at Broadway

{¶ 37} Nesser's second assignment of error states:

The conviction for rape counts 9 & 10 were against the manifest weight of the evidence and there was insufficient evidence to support the conviction because there was no evidence that Mr. Nesser raped [T.Y.] at the

. . . Broadway address.

**{¶ 38}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 39}** In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 40}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilso*n at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

**{¶ 41}** Counts Nine and Ten of the indictment charged Nesser with rape in violation of R.C. 2907.02(A)(1)(c) (substantial impairment) and R.C. 2907.02(A)(2) (forcible rape), respectively. The indictment did not specify the conduct associated with those counts. However, in its bill of particulars and during its opening statement, the State indicated that Nesser both vaginally and anally raped T.Y. at the Broadway house.[1]

---

[1] The bill of particulars stated that, while at an abandoned house, Nesser "raped [T.Y.] vaginally * * * while she was unconscious. After she regained consciousness, Nesser forcibly raped the victim anally." During opening statements, the prosecutor told the prospective jurors, "There are four rape counts. Those involve forcible rape and non-consenting rape when a person's not able to give consent. The rapes in these cases are alleged both anally and vaginally." Discussing the specific facts the State intended to prove, the prosecutor further stated:

> * * * The Defendant finds her. He takes her against her will to an abandoned house on Broadway. You will hear testimony of this. He beats her inside that house. He takes off his belt, and he hits

her with his belt. He puts the belt around her throat, drags her around the house like that, forces her down into a basement. She passes out; she is raped; she comes to; she's raped again both anally and vaginally. (Tr. 37)

The State argued in its closing argument, however, that Counts 9 and 10 both concerned anal rape of T.Y. by Nesser at the Broadway house. (Tr. 852-53.)

{¶ 42} At trial, the State provided sufficient evidence that Nesser raped T.Y. at the Broadway house while T.Y.'s "ability to resist or consent is substantially impaired because of a mental or physical condition" and that Nesser knew that T.Y.'s ability to resist or consent was substantially impaired. T.Y. testified that Nesser found her and took her to an abandoned house, which was determined to be on Broadway. While there, Nesser repeatedly shoved, punched, choked, and whipped and pulled T.Y. around with a belt, and rendered T.Y. unconscious. T.Y. testified that Nesser pulled down T.Y.'s pants as she was regaining consciousness. She stated that her first sensation was rectal pain – "pain from like he had been trying to sodomize me." T.Y. stated that nothing had happened prior to her being unconscious that would have caused rectal pain. T.Y.'s testimony, if believed, was sufficient to support a conviction for anal rape under R.C. 2907.02(A)(1)(c), and we cannot conclude that the jury lost its way in crediting T.Y.'s testimony. Count Nine was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 43} According to T.Y., after Nesser and T.Y. went into the basement of the Broadway house, Nesser pushed T.Y. onto the floor and prevented her from getting up. T.Y. stated that Nesser kept her down by her shoulders, neck, and arms, and he kicked her legs "to bring [her] down on the floor." While T.Y. was on the floor, Nesser stuck his fingers inside T.Y.'s vagina and "move[d] them around to where [it was] painful." T.Y. testified that she told Nesser "no" and "No, what are you doing?" She tried unsuccessfully to push him away. T.Y.'s testimony was also sufficient to support a conviction for forcible rape in violation of R.C. 2907.02(A)(2) and, upon review of the record as a whole, we cannot conclude that Nesser's conviction for forcible rape was

against the manifest weight of the evidence. Nesser's argument as to Count Ten also lacks merit.

{¶ 44}   Nesser's second assignment of error is overruled.

### IV.   Degree of Offense for Domestic Violence

{¶ 45}   Nesser's third assignment of error states:

The conviction for domestic violence [in] Counts 1, 7 & 16 were against the manifest weight of the evidence and there was insufficient evidence to support the conviction because there was no valid judgment of conviction constituting the necessary valid legal prior convictions against him to elevate this charge to a third degree felony.

{¶ 46}   Nesser claims that there was insufficient evidence to convict him of domestic violence as a felony of the third degree, because the State did not provide evidence of at least two prior judgments of convictions for domestic violence. Under R.C. 2919.25(D)(4), "[i]f the offender previously has pleaded guilty to or been convicted of two or more offenses of domestic violence * * *, a violation of division (A) or (B) of this section is a felony of the third degree * * *."

{¶ 47}   At trial, William Litteral, clerk of the Clark County Municipal Court, provided a certified copy of the "entry of conviction" for *State v. Robert Lynn Nesser*, Case No. 03-CRB-2421. The document (State's Exhibit 1) included Nesser's date of birth, social security number, height and weight. It further showed that Nesser had pled guilty to domestic violence, a first-degree misdemeanor, and was sentenced to six months in jail, to be served concurrently with another case. The municipal court

document was signed by the trial judge, but there was no indication that the entry was filed stamped or journalized. Litteral testified that Exhibit 1 "shows a finding of guilty for the offense of domestic violence."

{¶ 48} Ronald E. Vincent, clerk of the Clark County Court of Common Pleas provided a judgment of conviction in *State v. Robert Nesser*, Case No. 06-CR-799. That document (State's Exhibit 2) indicated that Nesser had entered a plea of guilty to domestic violence, a felony of the fourth degree, and that the trial court had found him guilty and sentenced him to six months in prison. The common pleas court judgment was signed by the trial judge, filed stamped, and journalized. The case file for Case No. 06-CR-799 included Nesser's social security number and date of birth, which were the same as the information in Case No. 03-CRB-2421.

{¶ 49} Officer Fleming, who arrested Nesser on May 11, 2012, testified that he completed an arrest report, which included Nesser's date of birth and social security number. Officer Fleming compared the information on the arrest report, which Nesser had provided, with the information on State's Exhibit 1; Fleming stated that the dates of birth and social security numbers were the same.

{¶ 50} Nesser argues that the municipal court document was not a valid judgment of conviction, because it failed to meet the requirements of *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163 and Crim.R. 32.

{¶ 51} Crim.R. 32(C) provides: "A judgment of conviction shall set forth the fact of conviction and the sentence. * * * The judge shall sign the judgment and the clerk shall enter it on the journal. A judgment is effective only when entered on the

journal by the clerk." In *State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142, which modified *Baker*, the Supreme Court of Ohio determined as follows: "A judgment of conviction is a final order subject to appeal under R.C. 2505.02 when it sets forth (1) the fact of the conviction, (2) the sentence, (3) the judge's signature, and (4) the time stamp indicating the entry upon the journal by the clerk." *Lester*, paragraph one of the syllabus. Nesser does not question that the common pleas court document constitutes a judgment of conviction under Crim.R. 32(C) and *Lester*.

{¶ 52} Under R.C. 2945.75(B)(1), the State may prove a prior conviction with "a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar." In *State v. Gwen*, 34 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, the Ohio Supreme Court held that "when the state chooses to prove a prior conviction by using a judgment entry, that entry must comply with Crim.R. 32(C)." *Gwen* at ¶ 1, ¶ 23. The supreme court further held, however, that "while R.C. 2945.75(B)(1) permits the state to prove a prior conviction by submitting a judgment entry of the conviction, the statute does not restrict the manner of proof to that method alone." *Id*. at ¶ 1, ¶ 22. The court stated: "By using the phrase 'pleaded guilty to' as an alternative to 'convicted of' in R.C. 2919.25(D)(4), the General Assembly has allowed the state to offer evidence of a defendant's guilty plea as proof of a prior offense of domestic violence." *Id*. at ¶ 11.

{¶ 53} The municipal court document shows the course of the criminal proceedings in Case No. 03-CRB-2421. The portion of the documents entitled "Entry-Misdemeanor" indicates that Nesser pled guilty to domestic violence and reflects

the sentence imposed; the judge signed the document beneath the sentence. Although the document is not time stamped and thus may not meet the requirements of Crim.R. 32(C) and *Lester* for a final appealable order, R.C. 2919.25(D)(4) elevates a domestic violence offense to a third degree felony if a defendant has "*pleaded guilty to* or been convicted of two or more offenses of domestic violence." (Emphasis added.) Litteral's testimony and State's Exhibit 1 provided sufficient evidence that Nesser pled guilty to domestic violence in Case No. 03-CRB-2421. Vincent's testimony and State's Exhibit 2 supported the conclusion that Nesser was convicted of domestic violence in Case No. 06-CR-799. Nesser's convictions in this case for domestic violence, as a third degree felony, were based on sufficient evidence and were not against the manifest weight of the evidence.

{¶ 54} Nesser's third assignment of error is overruled.

### V. Allied Offenses of Similar Import

{¶ 55} Nesser's fourth assignment of error states:

> The offenses that occurred at . . . Broadway should merge into a single sentence, the offenses that occurred at CVS should merge into a single sentence and the offenses that occurred at the Executive Inn should merge into a single sentence.

{¶ 56} In this assignment of error, Nesser claims that the trial court should have merged the various charges from each of the locations involved into a single charge for each location.

{¶ 57} R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 58}** "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. The Ohio Supreme Court explained:

* * * [T]he question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

(Citations and quotations omitted.) *Johnson* at ¶ 48-51.

{¶ 59}     Prior to sentencing, Nesser filed a motion for merger, claiming that "the offenses of domestic violence, felonious assault, robbery and kidnapping merge into a single sentence and that the rape, felonious assault and domestic violence also merge, requiring a single sentence on these offenses. Robert Nesser moves this Court to impose two separate sentences." Nesser's counsel repeated orally at sentencing:

We also feel that what happened at the Broadway address is separate and apart from the other events, that the Court must merge everything that is alleged to have happened at Broadway on the way to and on the way from Broadway. Everything that happened at CVS should be merged, and [the] Court should only impose those two sentences.

The trial court merged two felonious assault counts (Counts Five and Nineteen), but otherwise denied the motion. We review de novo the trial court's merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245.

{¶ 60}     As described by the State during closing argument, Count One (domestic violence) related to physical abuse T.Y. suffered at the house on Maiden Lane.

Count Two (felonious assault) related to being struck with a beer bottle at Marathon. These two events occurred at different times and at separate locations from the other counts, were based on separate conduct, and reflect a separate animus for each event. The trial court did not err in failing to merge these counts with each other or any other count.

{¶ 61} Counts Three through Ten involve acts related to the Broadway address. Count Three (kidnapping) related to Nesser's taking T.Y. from the street to the abandoned house. Count Four (felonious assault) concerned Nesser's repeated placing of T.Y. in a "sleeper hold" and rendering her unconscious. Count Five (felonious assault) related to Nesser's whipping T.Y. with the belt. Count Six (felonious assault) concerned Nesser's using the belt to wrap it around T.Y.'s neck and to drag her around the house. Count Seven (felonious assault) concerned "all the punches and kicks and pushes that [Nesser] inflicted on [T.Y.]" Count Eight (felonious assault) related to Nesser's assaulting T.Y. with the belt while in the basement of the Broadway house. Counts Nine (rape - substantial impairment) and Count Ten (forcible rape) concerned the rape of T.Y., anally and vaginally.

{¶ 62} Nesser's kidnapping of T.Y. by forcing her from the street and into the Broadway house (Count Three) was distinct from any of the acts that occurred inside the house. A separate animus for kidnapping exists where (1) "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm

separate and apart from that involved in the underlying crime." *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979), syllabus; *see also State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 52. Nesser's taking of T.Y. to the Broadway house involved moving T.Y. to a different location, increased her risk of harm, and exceeded the restraint necessary to commit the offenses inside the Broadway house. The trial court did not err in failing to merge Count Three with other offenses.

{¶ 63} In addition, the two rapes (Counts Nine and Ten) were separate acts from the felonious assaults and domestic violence inside the Broadway house and were distinct from each other. Nesser did not commit anal rape and vaginal rape with the same conduct, nor did the conduct giving rise to the felonious assault and domestic violence counts constitute rape. Thus, the trial court did not err in failing to merge counts Nine and Ten with each other or other counts.

{¶ 64} Counts Four, Five, Six, Seven, and Eight – all felonious assault charges – raise a more difficult question. Because all of the acts constitute felonious assault, we focus on whether Nesser's conduct constituted a single assault with a single animus. *See State v. Hudson*, 2013-Ohio-2351, 993 N.E.2d 443, ¶ 54 (2d Dist.). Our determination often hinges on the timing and location of the offenses. *E.g., State v. Rainer*, 2d Dist. Montgomery No. 25091, 2013-Ohio-963, ¶ 10 (concluding that the temporal separation between the knife blows, albeit slight, established separate acts of felonious assault); *State v. Wright*, 2d Dist. Montgomery No. 24276, 2011-Ohio-4874, ¶ 79 (theft was not an allied offense of similar import where there was "a distinct, temporal break between the commission of the aggravated burglary and aggravated

robbery offenses and the commission of the theft offense"). As for the defendant's animus, we look to the surrounding circumstances to determine whether the defendant acted with the same purpose, intent, or motive while committing the offenses. *See State v. Beverly*, 2d Dist. Clark No. 2011 CA 64, 2013-Ohio-1365, ¶ 42. We have recognized that a defendant's infliction of multiple wounds in rapid succession may constitute a single act with a single animus for purposes of an allied-offense analysis. *State v. McClendon*, 2d Dist. Montgomery No. 23558, 2011-Ohio-5067 (felonious assault and felony murder merged where five shots fired at victim in rapid succession caused victim's death).

**{¶ 65}** In this case, however, there was a physical and temporal separation between the assaults that occurred on the first floor and those that occurred in the basement of the Broadway house. And as for the events on each floor, the manner in which T.Y. was assaulted reflects a separate act and animus for each of the charges. Nesser's decision to place T.Y. in a "sleeper hold" to render her unconscious reflects a separate intent from his actions of removing his belt and repeatedly whipping her. Likewise, Nesser's conduct of wrapping the belt around T.Y.'s neck and dragging her around is separate and distinct from his punching and kicking her. The trial court did not err in failing to merge Counts Four, Five, Six, Seven, and Eight.

**{¶ 66}** Count Eleven (kidnapping) referred to Nesser's taking T.Y. from the Broadway house back to the Maiden Lane house. Count Twelve (kidnapping) was based on Nesser's taking T.Y. from the Maiden Lane house to CVS. Count Fourteen (robbery) was based on Nesser's taking T.Y.'s phone and money at CVS.

{¶ 67} The kidnappings were distinct acts from each other and from Nesser's actions at CVS. As with Nesser's taking T.Y. into the Broadway house, the movement of T.Y. from Broadway to Maiden Lane and from Maiden Lane to CVS was substantial and exceeded the restraint necessary to commit the robbery offense at CVS. The trial court properly determined not to merge Counts Eleven, Twelve and Fourteen.

{¶ 68} Count Fifteen (kidnapping) was based on Nesser's taking T.Y. to the Executive Inn. Count Sixteen (domestic violence) related to Nesser's beating and hitting T.Y. at the hotel. Count Seventeen (rape) refers to T.Y. being vaginally raped by Nesser at the hotel room. Count Eighteen (rape) refers to anal rape in the hotel room. As with Counts Three, Eleven, and Twelve, Nesser's moving of T.Y. to the Executive Inn exceeded the restraint necessary to commit other offenses at the hotel. Count Fifteen constituted a separate act with a separate animus. Nesser did not commit domestic violence through the same conduct as the rapes and kidnapping. In addition, Nesser separately committed the vaginal and anal rapes at the Executive Inn.

{¶ 69} In summary, the trial court did not err in separately sentencing Nesser for Counts One through Twelve and Counts Fourteen through Eighteen. Nesser's fourth assignment of error is overruled.

## VI. Sentencing

{¶ 70} Nesser's fifth assignment of error states:

The trial court abused its discretion when it sentenced Mr. Nesser to sixty-five (65) year[s] in prison and ordered that a majority of the counts be served consecutively.

{¶ 71} In this assignment of error, Nesser claims that the trial court abused its discretion in imposing consecutive sentences totaling 65 years in prison. He states that the trial court's sentence was "vindictive", and he suggests that he received a severe sentence because he previously rejected a plea offer. Nesser does not argue that his sentence was contrary to law or that the record does not support the trial court's findings under R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e) or (C)(4), or R.C. 2929.20(I), if any. *See State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 (2d Dist.) (discussing the post-H.B. 86 standard of review for felony sentencing under R.C. 2953.08(G)(2)).

{¶ 72} At sentencing, the State gave an extensive argument in support of a lengthy aggregate sentence. As part of that argument, the prosecutor stated:

As the Court is aware, the State made a plea offer to this Defendant prior to

trial. And that offer was for essentially one count for each type of crime:

One count of domestic violence, one count of felonious assault, one count of

kidnapping, one count of rape, one count of robbery. The Defendant rejected

this plea offer and the State was held to its burden of proof; and the State has

no problem accepting that, but the Defendant to this day denies his actions,

denies his responsibility.

The prosecutor did not indicate, and the record does not reflect, whether an agreed sentence was part of the plea offer and what sentence Nesser might have received.

{¶ 73} Even assuming that Nesser received a sentence significantly longer than he might have received had he accepted the State's offer, Nesser has not directed us to any evidence in the record that his sentence was vindictive, particularly given that he

was convicted of eighteen counts. Nor has he demonstrated any other basis for reversing his sentence.

{¶ 74}     Nesser's fifth assignment of error is overruled.

### VII.   Conclusion

{¶ 75}     The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Lisa M. Fannin
Christopher A. Deal
Hon. Richard J. O'Neill