[Cite as *State v. Spells*, 2024-Ohio-6052.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30055 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 03678 |
| | : | |
| RONALD T. SPELLS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 27, 2024

. . . . . . . . . . .

DAVID R. MILES, Attorney for Appellant

MATHIAS H. HECK, JR., by NATHAN B. VANDERHORST, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Ronald T. Spells appeals from his convictions for rape, aggravated burglary, and attempted rape. He argues that his conviction for aggravated burglary was not supported by sufficient evidence and that all three of his convictions were against the manifest weight of the evidence. Spells also challenges the trial court's suppression and

sentencing decisions. For the reasons outlined below, we will affirm the judgment of the trial court. However, we instruct the court to issue a nunc pro tunc judgment entry that includes its findings with respect to the imposition of consecutive sentences.

## I.    Background Facts and Procedural History

{¶ 2} On September 15, 2022, T.C. went to Cincinnati with her friends Megan and Kyle to watch another friend, Shawn, perform disc jockey services at a country club. T.C. and Megan lived in Kettering at the time. Shawn drove T.C., Megan, and Kyle to Cincinnati for the show; T.C., Megan, and Kyle took an Uber back to Megan's apartment after the show, between midnight and 1 a.m. Because it was late, T.C. and Kyle decided to sleep over at Megan's apartment. T.C. and Megan shared a bed in an upstairs bedroom, and Kyle slept downstairs on the couch.

{¶ 3} In the middle of the night, T.C. awoke to a cold touch sensation on her legs. She opened her eyes and saw a man standing over her and pointing a gun at her face. The man was wearing a black mask, t-shirt, jeans, and multicolored tennis shoes, and he was attempting to pull down her pants. T.C. slid out of the bed, and the man pulled down his pants, exposed his genitals, and pointed at the ground. T.C. held up her hands in a "don't shoot motion," started shaking and crying, and kneeled on the ground in compliance with the man's directions.

{¶ 4} When T.C. was face down on the ground, the man pulled down her pants. He attempted to insert his penis into her rectum, but penetration was unsuccessful. He then inserted his penis into her vagina and vaginally raped her. The man threatened to kill her and her friends if she did not remain silent. Megan remained asleep and unaware

of the unfolding situation.

{¶ 5} After the man raped T.C. for five to six minutes, he stopped, stood up, and motioned for T.C. to pull up her pants. He then gestured to T.C. to go out to the hallway and pointed down the stairs. He slowly walked T.C. down the stairs while holding the gun to her back and reminding her to be quiet or he would shoot everyone in the house. Kyle remained asleep on the couch.

{¶ 6} When they reached the bottom of the stairs, T.C. walked past the living room and toward the kitchen, where she noticed that the sliding glass back door was open. T.C. had not seen the man enter the apartment, did not see any other open windows or doors, and had not heard any doors open during the night. The man then left through the open glass door and ran west. T.C. immediately called 911, and the police were dispatched to the apartment. A canine unit was called to the scene and tracked west. The police called an ambulance for T.C., and she was transported to Sycamore Hospital in Miamisburg for a Sexual Assault Nurse Examiner (SANE) examination, during which DNA samples were collected from several areas of her body and clothing, including her underwear, vaginal area, and buttocks.

{¶ 7} Detective Justin Knight was assigned to investigate T.C.'s reported rape. He interviewed T.C. at Sycamore Hospital, where she described the perpetrator as a black man wearing a black face mask, dark-colored jeans, and multicolored shoes. Detective Knight collected the SANE kit from T.C.'s examination and sent it to the Bureau of Criminal Investigation (BCI) for testing.

{¶ 8} Detective Knight was later contacted by Katherine Dailey from BCI, who

advised him that a male DNA hit from the SANE kit was related to a Trotwood Police Department burglary case. After speaking with Dailey, Detective Knight received a call from Detective Jackson from Trotwood, who told Detective Knight that she had received the same call from BCI concerning a DNA hit in their burglary case. Detective Jackson said that their suspect was a man named Ronald Spells.

{¶ 9} The complainant in the Trotwood burglary case was Spells's ex-girlfriend, who told law enforcement officers that Spells had called her seven or more times an hour before the burglary and that she believed Spells was the person who had broken into her house. Detective Jackson told Detective Knight that Spells had a misdemeanor warrant for his arrest in that case, that she had knowledge of where he was located, and that officers from the Dayton Police Department would go to Spells's location and arrest him pursuant to the warrant.

{¶ 10} Because the DNA profile in the rape investigation matched the DNA profile in the Trotwood burglary case, Detective Knight drafted a search warrant for Spells's DNA, which was granted. He then went to the Montgomery County Jail to interview Spells after his arrest on the misdemeanor warrant. During the interview, Spells told Detective Knight his place of residence, which was in the same apartment complex where the rape had occurred (later determined to be approximately 500 feet away from Megan's apartment). Spells also admitted to being at home on the morning of the rape. At the conclusion of the interview, Detective Knight executed the DNA search warrant with a swab of Spells's cheek. Spells's DNA swab was sent to BCI for comparison with the results from the SANE kit, and BCI later determined that the DNA collected from the SANE

kit was attributable to Spells.

{¶ 11} After learning that Spells lived in the same apartment complex where the rape occurred, Detective Knight drafted a search warrant for Spells's residence, which was also granted. That search resulted in the recovery of a black face mask, black jeans, and multicolored PUMA shoes.

{¶ 12} On January 13, 2023, Spells was indicted on one count of rape (by force or threat of force) in violation of R.C. 2907.02(A)(2); one count of aggravated burglary (by force) in violation of R.C. 2911.11(A)(1); and one count of attempted rape (by force) in violation of R.C. 2907.02(A)(2) and R.C.2923.02. Spells entered not guilty pleas.

{¶ 13} Spells subsequently moved to suppress the evidence obtained during the execution of the search warrants for the collection of his DNA and the search of his residence. A hearing on Spells's motion to suppress was held, and the trial court denied his motion.

{¶ 14} The matter proceeded to jury trial on January 29, 2024.  The jury found Spells guilty on all three counts. At Spells's sentencing hearing, he argued that the trial court should merge the offenses and that his sentences should not run consecutively. The trial court disagreed with Spells; it determined that the three counts did not merge and imposed consecutive sentences, for an aggregate prison term of 30 to 35.5 years.

{¶ 15} Spells appeals.

## II.    Assignments of Error

{¶ 16} On appeal, Spells asserts the following six assignments of error:

THE  TRIAL  COURT  ERRED  IN  OVERRULING  APPELLANT'S

MOTION TO SUPPRESS EVIDENCE OBTAINED FROM A SEARCH WARRANT FOR COLLECTION OF APPELLANT'S DNA.

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM A SEARCH OF APPELLANT'S RESIDENCE.

APPELLANT'S CONVICTION OF AGGRAVATED BURGLARY IS BASED UPON INSUFFICIENT EVIDENCE.

APPELLANT'S CONVICTIONS FOR RAPE, AGGRAVATED BURGLARY, AND ATTEMPTED RAPE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

THE TRIAL COURT ERRED IN NOT MERGING THE OFFENSES OF RAPE AND ATTEMPTED RAPE WITH AGGRAVATED BURGLARY.

THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

{¶ 17} In his first and second assignments of error, Spells argues that the trial court erred in denying his motion to suppress the evidence obtained from his DNA swab and from the search of his residence. Spells contends that the unrelated burglary case in Trotwood could not serve as the basis for the search warrants in this case and that the affidavits accompanying the search warrants did not establish probable cause. We disagree.

{¶ 18} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon

probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized. *State v. Jones*, 2015-Ohio-483, ¶ 11-12. "The Supreme Court of the United States has provided that in determining whether a search warrant was issued upon a proper showing of probable cause, reviewing courts must examine the totality of the circumstances." *Id.* at ¶ 13, citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983). The duty of a reviewing court is simply to ensure that the trial court had a " 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.*, citing *Gates* at 238-239, quoting *Jones v. United States,* 362 U.S. 257, 271 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83 (1980).

{¶ 19} In conducting after-the-fact scrutiny of an affidavit submitted in support of a search warrant, appellate courts should accord great deference to the trial court's determination of probable cause, and "doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.* at ¶ 14, citing *State v. George,* 45 Ohio St.3d 325 (1989), paragraph two of the syllabus. "[A] probable cause determination must be limited to the four corners of the underlying affidavit." *State v. Eash*, 2005-Ohio-3749, ¶ 17 (2d Dist.), citing *State v. Klosterman*, 114 Ohio App.3d 327, 332 (2d Dist.1996).

{¶ 20} At a suppression hearing, the trial court serves as the trier of fact and judges the credibility of the witnesses and the weight of the evidence. *State v. Hurt*, 2006-Ohio-990, ¶ 16, citing *State v. Piggott*, 2002-Ohio-3810, ¶ 30 (2d Dist.). "In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the

facts as found." *Id.*, citing *State v. Baker*, 118 Ohio App.3d 654, 658 (12th Dist. 1997), citing *State v. Anderson*, 100 Ohio App.3d 688, 691 (4th Dist. 1995). "An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *Id.*, citing *State v. Armstrong*, 103 Ohio App.3d 416, 420 (9th Dist.1995).

{¶ 21} Prior to the suppression hearing, defense counsel asserted a right to a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), and claimed a denial of Spells's Fourth Amendment rights.

{¶ 22} At the suppression hearing in this case, Detective Knight testified regarding his interview with T.C. and the SANE kit collected from T.C., which was sent to BCI for testing. Detective Knight testified that, after the SANE kit was evaluated by BCI, Katherine Dailey from BCI advised him that there was a male DNA hit on the SANE kit and that the hit was related to a Trotwood burglary case. After speaking to Dailey, Detective Knight received a call from Detective Jackson from the Trotwood Police Department, who also confirmed that she had a DNA hit on the Trotwood burglary case, identifying the suspect in the burglary case as Spells.

{¶ 23} During the hearing, defense counsel pointed out that Spells had been identified as a potential suspect in the Trotwood burglary case by the complainant (Spell's ex-girlfriend), and that Spells's DNA had been obtained from a cigarette butt collected from the complainant's home. Defense counsel asserted, however, that, at the time the DNA from the cigarette butt was analyzed, no suspect name had yet been confirmed, and Spells was only linked to the burglary because the complainant believed that he could

have been the suspect.

{¶ 24} Defense counsel complained that Detective Knight's search warrant affidavit did not indicate that no suspect name had been confirmed at that time; he simply listed Spells's name as a suspect. Defense counsel contended that the DNA hit from the Trotwood burglary case was a hit that merely came back as an unidentified male (an unknown DNA contributor); thus, the DNA from the burglary case was not, in fact, matched to Spells, as suggested by Detective Knight. In so arguing, defense counsel asserted that Detective Knight had omitted significant details from the search warrant affidavit regarding the identification of Spells and that the information provided was misleading, because it read as though Spells was a confirmed suspect in the Trotwood burglary case based on the DNA hit from the cigarette butt.

{¶ 25} At the conclusion of the suppression hearing, the trial court found that Spells had failed to make a substantial preliminary showing that (1) a false statement or omission necessary to a finding of probable cause had been knowingly, intentionally, or recklessly included in or omitted from the affidavit and (2) the affiant, Detective Knight, with an intent to mislead, either excluded crucial information from the affidavit or provided false or misleading information in the affidavit. Thus, the court concluded that Spells was not entitled to a *Franks* hearing.

{¶ 26} Thereafter, the trial court issued a written decision overruling Spells's motion to suppress and his request for a *Franks* hearing. It found that the search warrants for Spells's DNA and residence and their accompanying affidavits had been sufficiently specific and that the warrants had been based on probable cause, describing

in detail the properties, items, and places to be searched and stating with particularity the items to be seized.

{¶ 27} Considering the totality of the circumstances, we conclude that the trial court had a substantial basis for finding that probable cause had existed for the search warrants.

{¶ 28} First, whether Spells had been charged or convicted in the Trotwood burglary case was not the sole basis in the affidavit for probable cause supporting the search warrant for Spells's DNA; the burglary was only one factor mentioned in the affidavit. The affidavit in support of the search warrant for Spells's DNA also stated that Detective Knight had been advised by Dailey at BCI that a DNA hit had been obtained from T.C.'s SANE kit and that it matched the DNA from a Trotwood burglary case. Detective Knight had also spoken to Trotwood Police Detective Jackson, who confirmed the DNA hit in the burglary case and the suspect as Spells. Detective Knight specifically sought to collect a sample of Spells's DNA and asserted that obtaining a DNA standard from Spells would assist in comparing the DNA profile that was collected in the SANE kit, thus including or excluding Spells as a DNA contributor. Detective Knight was not required to state in his affidavit that Spells initially became a suspect in the Trotwood burglary case because his ex-girlfriend had identified him as a possible suspect.

{¶ 29} Similarly, we believe that the issuing judge reasonably concluded that probable cause existed for the issuance of a search warrant for Spells's residence. In his affidavit to support the search warrant for Spells's residence, Detective Knight stated that Spells had admitted to living in the apartment complex where the rape occurred and to

being at his apartment on the morning of the rape. Detective Knight also noted that T.C. had reported that the perpetrator ran west upon leaving Megan's apartment, which was in the direction of Spells's residence, and that the canine unit had also tracked west very near to Spells's apartment. Detective Knight requested to search Spells's residence and to seize certain items potentially associated with the rape or described by T.C., including clothing, a cell phone, weapons and ammunition, illegal narcotics, safes and lock boxes, and any video surveillance footage. Although Spells contends that references within the affidavits to a burglary in another jurisdiction were improper, the references to the burglary in Trotwood were appropriate, because Detectives Knight and Jackson had received confirmation from BCI that their respective DNA samples matched, and Detective Jackson had informed Knight that Spells had been identified as the primary suspect in the Trotwood burglary case.

{¶ 30} We must accord great deference to a determination of probable cause, and we reiterate that doubtful or marginal cases should be resolved in favor of upholding a warrant. The search warrants in this case were based on probable cause. Thus, we cannot say that the trial court erred in overruling Spells's motion to suppress the evidence obtained pursuant to the search warrants. Spells's first and second assignments of error are overruled.

{¶ 31} In his third and fourth assignments of error, Spells contends that his conviction for aggravated burglary was based on insufficient evidence and that his convictions for rape, aggravated burglary, and attempted rape were against the manifest weight of the evidence. He specifically argues that there was insufficient evidence

demonstrating the element of force, stealth, or deception to trespass, which is necessary for an aggravated burglary conviction, because there was no evidence as to how Spells gained entry to the apartment, and any evidence presented was speculative. He also contends that the rape incident, as described by T.C., was not plausible because it allegedly occurred without waking the other apartment occupants. We disagree.

{¶ 32} A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380 (1997). The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991):

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus. In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 33} "In reviewing sufficiency-of-the-evidence claims, courts must remain mindful that the elements of an offense may be established by direct evidence,

circumstantial evidence, or both." *State v. Crossley*, 2016-Ohio-3196, ¶ 16, citing *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960). "Circumstantial and direct evidence are of equal evidentiary value." *Id.*, citing *State v. Jenks* at 272 ("Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence."). When reviewing the value of circumstantial evidence, "the weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." *Id.*, quoting *Donaldson v. N. Trading Co.,* 82 Ohio App.3d 476, 483 (10th Dist. 1992).

{¶ 34} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1983), which states:

> . . . [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. . . .

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the

evidence presented." (Citation omitted.) *Wilson* at ¶ 14.

**{¶ 35}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.).

**{¶ 36}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact primarily to resolve. *Wilson* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997), we explained:

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

**{¶ 37}** Additionally, the trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.), citing *State v. Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). "To that end, the fact finder is

free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id.*, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Moreover, "[i]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson* at ¶ 17.

{¶ 38} With respect to the third assignment of error, Spells was convicted of aggravated burglary under R.C. 2911.11(A)(1). A person commits aggravated burglary when he uses force, stealth, or deception to trespass in an occupied structure when another person other than an accomplice of the offender is present, and the offender inflicts or attempts or threatens to inflict physical harm on another. R.C. 2911.11(A)(1). A trespass occurs when an offender knowingly enters or remains on the premises of another without privilege to do so. R.C. 2911.21(A)(1). "Privilege" means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity. R.C. 2901.01(A)(12).

{¶ 39} "The methods of trespass in the aggravated burglary statute—force, stealth, or deception—are written in the disjunctive, therefore the state only needed to prove one of the three methods." *State v. Kirby*, 2020-Ohio-4005, ¶ 30 (12th Dist.), citing *State v. Shepherd*, 2017-Ohio-328, ¶ 17 (12th Dist.), citing *State v. Bell*, 1994 WL 29877, *6 (Jan.

31, 1994). "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. R.C. 2901.01(A)(1). "Force" is satisfied by "any effort physically exerted." *State v. Johnson*, 2017-Ohio-5498, ¶ 21 (2d Dist.), citing *State v. Snyder*, 2011-Ohio-175, ¶ 18 (9th Dist.). In Ohio, courts have observed that force is used when a person opens an unlocked screen door to trespass into a home. *See State v. Albertson*, 2021-Ohio-2125, ¶ 74 (2d Dist.) ("For example, opening an unlocked screen door and walking through an open interior door is sufficient to establish entry by force."), citing *State v. Cantrell*, 2016-Ohio-7623, ¶ 12 (2d Dist.); *see also State v. McWilliams*, 2001 WL 1203395, *3 (2d Dist. Oct. 12, 2001) ("In Ohio, opening a closed but unlocked door amounts to sufficient force to prove the element of force in the offense of Burglary"); *State v. Ford*, 1996 WL 257442, *2 (2d Dist. May 17, 1996) ("[t]he effort necessary to open a door, locked or unlocked, is sufficient to satisfy the element of 'force' necessary to prove burglary"). " 'Stealth' has been defined as " 'any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission.' " *State v. Butler*, 2011-Ohio-1233, ¶ 23 (8th Dist.), citing *State v. Sims,* 2005-Ohio-1978, ¶ 5 (8th Dist.), quoting *State v. Ward*, 85 Ohio App.3d 537, 540 (3d Dist.1993).

{¶ 40} In this case, T.C. testified that she saw that the sliding glass back door was open when she came down the stairs with Spells and that Spells left the apartment through the same door. The act of opening an unlocked closed door to trespass into a home is sufficient to establish entry by force, and the jury was permitted to infer that Spells had entered the apartment that way. Additionally, T.C. testified that she did not see Spells

enter the apartment and that no one in the house let Spells in; as such, the jury was permitted to infer that Spells was stealthy and entered the apartment without permission. Moreover, even if Spells had had permission to enter (of which there was no evidence), the jury was permitted to infer that his act of possessing and pointing a gun at T.C. was performed with force and that committing a crime with a gun was sufficient to revoke permission and support an aggravated burglary conviction. Although Spells contends that this evidence was speculative, circumstantial evidence is given the same weight as direct evidence, and an inference can be "disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence."

{¶ 41} Based on these facts, we cannot say that inferences regarding Spells's entry into the apartment by way of force or stealth were not supported by the evidence. A rational trier of fact could have found that the State presented evidence beyond a reasonable doubt that established Spells had committed the essential elements of aggravated burglary. Accordingly, Spells's third assignment of error is overruled.

{¶ 42} In his fourth assignment of error, Spells contends that all three of his convictions were against the manifest weight of the evidence. In addition to his conviction for aggravated burglary, Spells was convicted of the rape (vaginal) of T.C. by force or threat of force under R.C. 2907.02(A)(2), which states:

> No person shall engage in sexual conduct with another when the offender
>
> purposely compels the other person to submit by force or threat of force.

Spells was also convicted of the attempted rape (anal) of T.C. under R.C. 2907.02(A)(2) and R.C. 2923.02.

{¶ 43} At the outset, we note that a rape conviction may be based solely on the victim's testimony, and physical evidence is not required to support a conviction for rape against a manifest weight challenge. *See State v. Thomas*, 2018-Ohio-4345, ¶ 25 (2d Dist.).

{¶ 44} At trial, T.C. testified that, after gaining entry to Megan's apartment without permission and threatening to kill her, Spells attempted to anally rape her and successfully vaginally raped her while pointing a gun at her. T.C. notified the police of the incident and was transported to the hospital, where she underwent a SANE examination. During the examination, T.C.'s underwear, vaginal area, and buttocks were swabbed for potential DNA, and the swabbed samples were sent to BCI for analysis. Dailey from BCI testified that she was able to determine that DNA attributed to Spells was present in the collected samples. Spells did not testify.

{¶ 45} "The jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony." (Citation omitted.) *State v. Arega*, 2012-Ohio-5774, ¶ 30 (10th Dist.). Although Spells contends that T.C.'s description of the incident was not plausible and the jury lost its way, the jury was permitted to find T.C.'s testimony credible, and the credibility of her testimony was bolstered by the physical evidence obtained during her SANE examination, which established that Spells's DNA was present.

{¶ 46} Considering the testimony in the record, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice by believing the testimony, as

the jury was in the best position to weigh the witnesses' credibility. For the foregoing reasons, we do not find that Spells's convictions for rape, aggravated burglary, and attempted rape were against the manifest weight of the evidence. Spells's fourth assignment of error is overruled.

{¶ 47} In his fifth assignment of error, Spells contends that the trial court erred in not merging his offenses.

{¶ 48} Under Ohio law, R.C. 2941.25 governs allied offenses of similar import and provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 49} R.C. 2941.25 focuses on the defendant's conduct, and "at its heart, the allied-offense analysis is dependent upon the facts of a case." *State v. Ruff*, 2015-Ohio-995, ¶ 26. The prosecution selects the charges that may be brought against a defendant "based upon the criminal conduct of an accused," and "that conduct may potentially support convictions of multiple offenses." *Id.* at ¶ 13. "When the defendant's conduct

constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *Id.* at ¶ 24, citing R.C. 2941.25(B).

{¶ 50} Under R.C. 2941.25(A), "[i]f the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *State v. Johnson*, 2010-Ohio-6314, ¶ 48, *abrogated by Ruff* at ¶ 48. "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *Ruff* at paragraph one of syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of syllabus. "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus.

{¶ 51} Spells was convicted of rape (vaginal), aggravated burglary, and attempted rape (anal). Spells contends that the aggravated burglary charge in the indictment specifically stated that Spells did inflict or attempted to inflict physical harm on T.C. and

that the same element constituted the same conduct for the rape and attempted rape charges. Thus, Spells argues that the aggravated burglary and rape charges should have merged. We disagree.

{¶ 52} With respect to Spells's convictions for rape and attempted rape, "anal rape and vaginal rape do not involve the same conduct." *State v. Coleman*, 2015-Ohio-5381, ¶ 25 (2d Dist.), citing *State v. Nesser,* 2014-Ohio-1978, ¶ 63 (2d Dist.). Other courts have also held that penetration of separate bodily orifices constitutes separate acts of rape. *Id.*, citing *State v. Wilson,* 8 Ohio App.3d 216 (8th Dist.1982); *State v. Ludwick,* 2004-Ohio-1152 (11th Dist.). Such offenses cause separate identifiable harm. Thus, the trial court did not err in not merging these offenses.

{¶ 53} Regarding Spells's conviction for aggravated burglary, we previously explained in *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.), that, "because one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other." In *Turner*, when the defendant, armed with a shotgun, forced his way into an apartment intending to steal drugs and money from the victim, we found that the aggravated burglary offense had been completed when the defendant entered the apartment. *Id.* Then, once inside, when the defendant held the victim at gunpoint while demanding drugs and money and stealing a television, a new, separate crime (aggravated robbery) arose, which was committed separately from the completed aggravated burglary offense. *Id.* ("Whether an intended felony was committed is irrelevant to the burglary charge.) *See Boyer v. Maxwell*, 175

Ohio St. 318, 319 (1963), for a similar analysis in the context of breaking and entering. "But where the intended felony is actually committed, a new crime arises for which the defendant may be convicted." *Turner* at ¶ 22, quoting *State v. Frazier*, 58 Ohio St.2d 253 (1979).

{¶ 54} Like in *Turner*, the burglary, rape, and attempted rape in this case were committed separately. When Spells forced the sliding door open with the intent to rape T.C., held her at gunpoint, and threatened to kill her, the burglary was completed. Spells had not yet committed the rape or attempted rape at that point. When Spells raped and attempted to rape T.C. in the upstairs bedroom, he perpetrated two new crimes, which were committed separately from the completed aggravated burglary offense. Accordingly, we find that Spells's offenses of aggravated burglary, rape, and attempted rape were committed separately. The trial court did not err, because merger for purposes of sentencing was not required. Spells's fifth assignment of error is overruled.

{¶ 55} Finally, in his sixth assignment of error, Spells argues that the trial court erred by imposing consecutive sentences. In response, the State asserts that the record supported the imposition of consecutive sentences, and thus the trial court did not err in ordering consecutive sentences. However, the State points out that the trial court did not include its findings regarding consecutive sentences in its judgment entry, and it suggests that the trial court may correct its mistake through a nunc pro tunc entry. We agree with the State.

{¶ 56} A trial court may impose consecutive sentences under R.C. 2929.14(C)(4), which provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 57} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state

reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. "A trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Id*. at ¶ 30, citing *State v. Qualls,* 2012-Ohio-1111, ¶ 15 (where notification of postrelease control was accurately given at the sentencing hearing, an inadvertent failure to incorporate that notice into the judgment entry may be corrected by a nunc pro tunc entry without a new sentencing hearing).

{¶ 58} R.C. 2953.08(G)(2)(a) compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support the sentencing court's findings under certain relevant statutes or if the sentence is otherwise contrary to law. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *State v. Marcum*, 2016-Ohio-1002, ¶ 22, quoting *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 59} In sentencing Spells to consecutive sentences under R.C. 2929.14(C)(4), the trial court opined that not much was worse than a stranger rape where a man breaks into someone's house, forces a woman at gunpoint to have sex with him, threatens to kill her and the others in the house if she makes any noise, and then orders her down the

stairs at gunpoint before escaping out the back door. The court, authorized under R.C. 2929.14(C)(4) to impose consecutive sentences, found that consecutive sentences were necessary in this case to protect the public from future crime, to punish Spells for his conduct, and that consecutive sentences were not disproportionate to the seriousness of the misconduct and the danger posed to the public.

**{¶ 60}** Our review of the record reveals that the facts amply supported the sentences imposed by the trial court. We do not find by clear and convincing evidence that the record does not support the trial court's findings or that the sentences were otherwise contrary to law. Therefore, we cannot say that the trial court erred in imposing consecutive sentences, and Spells's sixth assignment of error is overruled.

**{¶ 61}** Having overruled Spells's assignments of error, the judgment of the trial court is affirmed. However, the trial court did not include its findings regarding consecutive sentences in its judgment entry. Therefore, we instruct the trial court to correct its mistake through a nunc pro tunc entry.

. . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.