[Cite as *State v. Smith*, 2025-Ohio-679.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30248 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 01030 |
| | : | |
| TONY LEE SMITH JR. | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 28, 2025

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Tony Lee Smith, Jr., was found guilty after a jury trial in the Montgomery County Court of Common Pleas of four counts of aggravated murder, two counts of aggravated robbery, two counts of aggravated burglary, two counts of murder, two counts of felonious assault, and two counts of tampering with evidence, and numerous

accompanying firearm specifications.   After merging multiple charges and specifications, the court sentenced him to an aggregate term of life in prison with the possibility of parole after 30 years for aggravated murder (Count 1), aggravated robbery (Count 6), and tampering with evidence (Count 13), plus six years for firearm specifications on Counts 1 and 2.   Smith was ordered to pay restitution and court costs and to register with the Violent Offender Registration Database upon his release from prison.

{¶ 2} Smith appeals from his conviction, raising five assignments of error.   He claims that the trial court erred in (1) denying his motion to suppress evidence from his backpack; (2) imposing a three-year sentence for the firearm specification in Count 2, which was merged with Count 1; and (3) imposing restitution of approximately $10,000 without considering his ability to pay.   Smith further asserts that Count 13 was duplicitous in that it was based on his alleged tampering with two different objects.   Finally, Smith claims that the jury's verdicts for aggravated murder, murder, and aggravated burglary were based on insufficient evidence and against the manifest weight of the evidence.

{¶ 3} For the following reasons, Smith's conviction for tampering with evidence will be reversed.   In all other respects, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 4} On the morning of April 6, 2022, Smith went to the residence of Dylan Judd, a marijuana dealer, on East Pearl Street in Miamisburg.   While there, Smith shot Judd twice in the head and left with several of Judd's possessions, including a white Xbox, a blue Xbox controller, and a box containing a nectar collector.   Because Judd had stopped responding to text messages, Judd's fiancée returned home, found him, and called 911.

The responding officer saw that Judd was deceased.

{¶ 5} The police investigation proceeded rapidly.   By the end of the day, the police had acquired surveillance video from a neighbor showing possible visitors to the home. Of particular note, at 11:48 a.m., a man wearing a red sweatshirt and camouflage pants and carrying a black backpack (later identified as Smith) had left Judd's residence and ridden away on a bicycle.   The bicycle was found near the intersection of East Central Avenue and North 12th Street.

{¶ 6} The following day, detectives reviewed videos of Smith leaving the bicycle on 12th Street and going behind and into the CVS store across the street.   They also located Judd's smashed cell phone behind the CVS.   While detectives were there, Smith returned to the CVS, and the store manager notified the detectives.   Detective Nicholas Bell contacted Officer Joseph Dooley for assistance with conducting a stop, and he followed Smith when he left the CVS.

{¶ 7} Officer Dooley approached Smith while he was in the parking lot of the nearby Walgreens.   When Dooley told Smith that he smelled the odor of marijuana, Smith indicated it was located in his backpack and he permitted Dooley to search the backpack.   Dooley located marijuana, a white Xbox, a blue Xbox controller, a nectar collector, and other items belonging to Judd.   Officer Dooley transported Smith to the police department, where he was interviewed by Detective Jason Threlkeld, the lead detective on Judd's case, and Detective Bell.   Smith ultimately admitted to being in Judd's residence on April 6 but denied killing him and stealing his belongings.

{¶ 8} On April 15, 2022, Smith was charged in a 14-count indictment with four

counts of aggravated murder (Counts 1-4), two counts of aggravated robbery (Counts 5-6), two counts of aggravated burglary (Counts 7-8), two counts of murder (Counts 9-10), two counts of felonious assault (Counts 11-12), and two counts of tampering with evidence (Counts 13-14), along with numerous accompanying firearm specifications. Smith moved to suppress all evidence seized from him, including the items contained in his backpack, and all statements he made to the police. After a hearing, the trial court suppressed the statements Smith made to Officer Dooley in the cruiser on April 7 but otherwise denied Smith's motion. Of relevance here, the trial court concluded that Smith had voluntarily consented to the search of his backpack.

{¶ 9} The matter proceeded to a jury trial on May 6, 2024. The State orally dismissed Count 14 (tampering with evidence) and offered evidence on the remaining 13 charges and specifications. During Smith's presentation of evidence, defense counsel attempted to call an individual as an alternative suspect, but the man invoked his Fifth Amendment rights, and the court did not allow him to be called as a witness. Smith then presented one witness, his employer. After deliberating, the jury found Smith guilty of all charges and specifications. The court ordered a presentence investigation, and the parties submitted sentencing memoranda.

{¶ 10} At sentencing, the trial court merged the aggravated murder, aggravated burglary, murder, and felonious assault charges and sentenced Smith to an aggregate term of life in prison with the possibility of parole after 30 years for aggravated murder (Count 1), plus six years for firearm specifications on Counts 1 and 2. It further merged the two aggravated robbery counts and imposed a minimum term of ten years to a

maximum term of 15 years on Count 6, to be served concurrently with Count 1. The court imposed three years in prison for tampering with evidence (Count 13), to be served concurrently. Smith's aggregate prison sentence was life in prison with the possibility of parole after 36 years. The court found that Smith was entitled to 812 days of jail time credit.

{¶ 11} Smith was ordered to pay restitution of $1,704.76 to Judd's sister for funeral expenses, $282.50 to Judd's mother for burial expenses, and $8,000 to the Ohio Victims of Crime Compensation Fund, plus court costs. The court advised Smith of his duty to register with the Violent Offender Registration Database upon his release from prison.

{¶ 12} Smith appeals from his conviction, raising five assignments of error. We will address them in an order that facilitates our analysis.

## II. Motion to Suppress

{¶ 13} In his second assignment of error, Smith claims that the trial court erred in failing to suppress the evidence found in his backpack. Smith concedes that consent constitutes a valid exception to the warrant requirement, but he asserts that the trial court erred in two respects. First, he argues that the trial court erred in relying upon the testimony of Officer Dooley and Detective Bell, which was not credible. Second, he contends that his consent to search was not voluntary.

{¶ 14} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*,

2015-Ohio-4612, ¶ 10 (2d Dist.). As a result, we must accept the trial court's factual findings if they are supported by competent and credible evidence. *Id.*; *State v. Hale*, 2024-Ohio-4866, ¶ 12. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Turner* at ¶ 10, quoting *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.). The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2021-Ohio-4230, ¶ 10 (2d Dist.).

{¶ 15} Because Smith's challenge to the trial court's suppression ruling is limited to the lawfulness of the search of his backpack, we will focus on the facts and legal standards that are relevant to that issue.

**A. Evidence at Suppression Hearing**

{¶ 16} The State presented three witnesses at the suppression hearing: Officer Dooley, Detective Bell, and Detective Threlkeld. It also offered several exhibits. The State's evidence established the following facts.

{¶ 17} On the morning of April 7, 2022, the day after the murder, Detective Bell went to the CVS store on Central Avenue to look for evidence behind the store. While there, the store manager informed him that the suspect, later identified as Smith, was presently in the store. Bell went to his unmarked vehicle to watch for Smith and called Officer Dooley for assistance.

{¶ 18} At approximately 2:30 p.m., Officer Dooley received a phone call from Detective Bell that the shooting suspect had just left the CVS and he needed a marked

patrol unit to assist in stopping him. As Dooley went to locate Smith, Detective Bell provided Smith's description and updates on Smith's location. He also conveyed that Smith had jaywalked across Central Avenue.

{¶ 19} Officer Dooley located Smith in a nearby Walgreens parking lot, talking on his cell phone. Dooley drove into the lot without his lights or siren on, parked his cruiser, approached Smith, and asked if he could talk to Smith for a second. Smith immediately came toward the officer. Detective Bell, who had followed Smith to the Walgreens, also walked over. As Smith neared, Officer Dooley and Detective Bell could smell raw marijuana. Dooley asked Smith if he could pat him down for weapons. Smith agreed and removed his backpack. Officer Dooley asked Smith if he had any weapons on him, and Smith said he was a convicted felon and could not carry a weapon.

{¶ 20} Officer Dooley then asked Smith about the odor of marijuana. Smith confirmed that the smell was coming from his backpack and that the backpack contained marijuana. When Officer Dooley asked if he could take a look in the backpack, Smith said he could. Officer Dooley acknowledged that this conversation was not captured by his body camera, because the microphone was not working that day.

{¶ 21} Dooley had Smith sit in his cruiser, without handcuffs, while he looked through the backpack on the front of his patrol vehicle. The officer located a gallon-sized plastic bag about one-third full of marijuana. In another pouch of the backpack, he found, among other items, a white Xbox gaming console with apparent dried blood on it. Detective Bell, who was standing with Officer Dooley, noticed a box labeled nectar collector. Detective Bell relayed what they had found to Detective Threlkeld, who

confirmed that these items were missing from Judd's residence. Bell told Dooley that they were going to stop the search. The items were returned to the backpack, and the officer secured the backpack in his vehicle.

{¶ 22} On several occasions while Smith was seated in the cruiser, officers opened the door to check on him and/or to ask him questions. Smith also knocked on the window to get the officers' attention to ask them questions. At no time did Smith revoke his consent to the search of his backpack.

**B. Law and Analysis**

{¶ 23} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). In general, a search must be based on probable cause and executed pursuant to a warrant. *E.g., Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Moore*, 90 Ohio St.3d 47, 49 (2000). "Consent is an exception to the warrant requirement, and requires the State to show by clear and positive evidence that the consent was freely and voluntarily given." *State v. George*, 2014-Ohio-4853, ¶ 28 (2d Dist.).

{¶ 24} This court has considered six factors in determining the voluntariness of consent: (1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence

would be found.   *State v. Moore*, 2019-Ohio-648, ¶ 23 (2d Dist.); *State v. Weisgarber*, 2017-Ohio-8764, ¶ 24 (2d Dist.), citing *State v. Terrell*, 2017-Ohio-7097, ¶ 82 (2d Dist.).

{¶ 25} On the record before us, the trial court did not err in concluding that Smith had voluntarily consented to the search of his backpack.   Both Officer Dooley and Detective Bell testified that Dooley asked for consent to search the backpack and Smith agreed.   The trial court credited this testimony, and we defer to the trial court's factual findings.

{¶ 26} In addition, there is nothing to suggest that Smith's consent was not voluntary.   Officer Dooley approached Smith in a store parking lot and asked to speak to him.   Smith was cooperative and came toward the officer.   Detective Bell, who walked over from his unmarked vehicle, was the only other law enforcement officer who was present at this time.   (Officer Dooley's cruiser video shows other officers there while Smith was seated in the cruiser.)   Soon after the encounter began, Smith agreed to a pat down, acknowledged that the odor of marijuana came from marijuana in his backpack, and agreed to the officer's looking inside the backpack.

{¶ 27} There is no evidence that the law enforcement officers used any coercive measures to obtain Smith's consent.   Officer Dooley had driven into the parking lot without lights and sirens, and nothing suggests that Dooley or Bell displayed any threatening or coercive behavior to gain Smith's compliance.   Although the State did not present specific evidence of Smith's education or intelligence, nothing suggests that Smith's level of education or intelligence precluded him from voluntarily consenting to the officer's request.   To the contrary, Smith's interactions with law enforcement – including

his conversation with Officer Dooley in the cruiser and his subsequent interview with detectives – demonstrated otherwise.

{¶ 28} Smith's backpack contained incriminating evidence, but Smith could have reasonably believed that the officers would not recognize the Xbox and other objects as evidence related to the murder and that he would be better off allowing the officer to see the marijuana, which Officer Dooley could already smell. Neither Officer Dooley nor Detective Bell advised Smith that he had the right to refuse to consent, but that alone is not dispositive of the voluntariness of Smith's consent. *See Moore*, 2019-Ohio-648, at ¶ 25, citing *Scheckloth v. Bustamonte*, 412 U.S. 218, 234 (1973). Moreover, Smith was familiar with the criminal justice system, having previously been convicted of a felony.

{¶ 29} On the record before us, the trial court did not err in concluding that Smith voluntarily consented to the search of his backpack. Accordingly, Smith's second assignment of error is overruled.

### III. Sufficiency and Manifest Weight of the Evidence

{¶ 30} In his fifth assignment of error, Smith claims that his convictions for aggravated murder, murder, and aggravated burglary were based on insufficient evidence and against the manifest weight of the evidence.

{¶ 31} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the

State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 32} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

### A. Aggravated Murder and Murder

{¶ 33} Smith was charged in Counts 1 to 4 with aggravated murder in violation of R.C. 2903.01(B), which states: "No person shall purposely cause the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present

or likely to be present, terrorism, or escape."

{¶ 34} Counts 9 and 10 alleged felony murder in violation of R.C. 2903.02(B). That statute provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree," other than voluntary manslaughter and involuntary manslaughter.

{¶ 35} On appeal, Smith argues that the State failed to prove that he shot Judd. He emphasizes that there was no direct evidence of his involvement, and he argues that a third party killed Judd, who was a drug dealer. Smith notes that his efforts to present evidence of an alternative suspect were frustrated when his witness invoked his Fifth Amendment rights and refused to testify.

{¶ 36} As Smith observes, there was no direct evidence that he was responsible for Judd's murder. However, circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147 (1988); *State v. St. John*, 2019-Ohio-650, ¶ 49 (2d Dist.). In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991).

{¶ 37} In this case, the State presented substantial circumstantial evidence that Smith had murdered Judd. According to the State's evidence, Judd resided at the Pearl Street home with his fiancée, Laurin, and her school-aged son. Judd sold marijuana and was a gun enthusiast. In early April 2022, Judd had five guns in the home, including a .38 caliber revolver that he had recently purchased. On April 3, 2022, Smith, who

purchased marijuana from Judd, texted with Judd about the revolver, indicating that it's "what I really need."   State's Ex. 145b.

{¶ 38} During the morning of April 6, 2022, Smith twice texted Judd.   At 5:20 a.m., he asked Judd if he was "tryna kick it today."   State's Ex. 145a.   Less than a minute later, Smith texted his boss, "I don't think ima make it from Miamisburg this morning the bus broken down rite now[.]"   (Errors in original.)   State's Ex. 150.   A few hours later, Smith asked Judd if he was "mobile."   State's Ex. 145a.   Judd did not respond to Smith's texts.

{¶ 39} Laurin testified that she and her son left the house at approximately 8:15 a.m., and she began texting with Judd starting at 9:18 a.m.; they communicated regularly throughout the morning.   See State's Ex. 24.   Much of the movement around Judd's home following Laurin's departure was captured by surveillance video from a neighbor's home at the corner of North 11th Street and East Pearl Street.   At 9:32 a.m., Judd's friend, Dustin Allison, arrived in a white box truck.   See, e.g., State's Ex. 17.   Allison went inside the house while his co-worker remained in the truck.   According to video evidence and testimony from Allison and one of Judd's neighbors, Allison and the box truck left at 9:39 a.m., seven minutes later.

{¶ 40} At 10:46 a.m., a man wearing in a red sweatshirt and camouflage pants and carrying a black backpack rode to Pearl Street on a green bicycle, left the bike at the end of Judd's neighbor's driveway, and walked away along 11th Street.   Smith admitted to detectives that he was the person in the video.   State's Ex. 139.   Although not captured by the video camera, Smith later admitted to detectives that he had returned to the home,

gone inside, and been "kickin' it with" Judd. While Smith was there, Judd communicated with his brother about the brother coming over. Judd's brother testified that he heard someone in the background while having a video-chat with Judd, and Smith told detectives that Judd had been talking to someone else about coming over.

{¶ 41} Laurin received her last text from Judd at 11:17 a.m. Judd's brother last received a text from Judd at 11:26 a.m. *See* State's Ex. 19. He thought Judd was going to pick him up. When Judd did not arrive, he tried to video-chat with Judd at 11:48 a.m., but Judd did not answer.

{¶ 42} At about 11:48 a.m., Smith admittedly left from the rear of Judd's home and rode away on the green bicycle. *See* State's Exs. 17, 139. He rode to the intersection of North 12th Street and East Central Avenue, where he abandoned the bicycle in the grass. State's Ex. 88. Smith crossed 12th Street to the CVS store and walked behind it. During the police investigation, Judd's smashed phone and phone case were located behind the CVS.

{¶ 43} Smith entered the CVS and, at 11:58 a.m., he provided $50 for an electronic cash transaction. *See, e.g.,* Ex. 104. Smith then left CVS, went to an RTA bus stop, and travelled to downtown Dayton. *See* Ex. 135.

{¶ 44} At 11:58 a.m., Laurin's texts stopped being delivered. Concerned, Laurin left work and drove home to check on Judd, arriving at approximately 12:31 p.m. Although there were gaps in the surveillance video from the neighbor's camera, no one was recorded arriving at or departing from Judd's residence between Smith's departure at 11:48 a.m. and Laurin's arrival.

{¶ 45} Laurin was unable to enter through the front door because the storm door was locked, which was unusual (they always used the front door, she said), and she found the back door, which they did not typically use, unlocked. She entered the home and found Judd, face down and lying in blood, partially in the bathroom and partially in the hallway. Laurin called 911. Judd was unresponsive, but Laurin heard him make a gurgling noise when she tried to roll him over by the waist.

{¶ 46} Officer Christopher Taubert was the first to respond. The area around Judd's upper body was bloody with a pool of blood around Judd's head, and there were smears of blood on the hallway floor, the lower bathroom wall by the door, and the doorframe. A bloody handprint was visible below the bottom hinge of the adjacent bedroom door.

{¶ 47} Officer Taubert testified that he did not attempt to render aid, because he could tell that Judd was deceased. Taubert reached that conclusion based on the amount of blood on the floor, the gunshot wound to the back of Judd's head, the lack of active bleeding from the wound, and the brain matter he saw coming from Judd's head. The officer did not notice any breathing or spontaneous movements by Judd, and the only sound he heard from Judd was the brain matter dripping.

{¶ 48} The autopsy revealed that Judd had died from gunshot wounds to the head. Judd had been shot twice: once to the top of his forehead and once to the back of his head. The front shot fractured his skull but was not fatal, and it may or may not have caused loss of consciousness. The wound to the back of the head was fatal and would have caused immediate loss of consciousness. Based on the star-shaped entrance

wound, the muzzle of the gun was close to, if not touching, Judd's scalp when that shot was fired. When asked if a person may still breathe, gurgle, move, or have a pulse after the gunshot wound, the deputy coroner testified that it was possible to have these behaviors for five minutes, but they were less and less likely as time passed; typically, life ceased quickly. He further indicated that it was not uncommon for a body to make sounds after death if air were pushed through the larynx.

{¶ 49} The next day, Officer Dooley and Detective Bell apprehended Smith in a Walgreens parking lot, shortly after Smith had returned to the CVS store. Smith was carrying a backpack with a baggie of marijuana, as well as several items that Laurin indicated were missing from the home, including a white Xbox, a blue Xbox controller, and a box containing a nectar collector. Laurin identified the Xbox, controller, and nectar collector as Judd's. In addition, Laurin had previously pawned and redeemed the Xbox, and its serial number matched the one in Smith's backpack. *See* State's Ex. 112, 113. Judd's revolver was also missing from the home, but it was never found. That same day, officers conducted a search at Smith's girlfriend's apartment. An inside-out red sweatshirt with Smith's employer's name on the back was recovered in the dumpster.

{¶ 50} Detectives Threlkeld and Bell interviewed Smith at the police station on April 7, 2022. *See* State's Ex. 139. Initially, Smith denied having been to the CVS store the previous day, and he claimed the Xbox and other items were his, having bought them second-hand at the RTA bus hub. He explained that he was supposed to go to work on April 6, but his boss told him not to come in. Smith told the detectives that he went to downtown Dayton and then to a house in Trotwood.

{¶ 51} When confronted with video and photographic evidence that his story was untrue, Smith admitted that photos from the CVS store showed him in his sweatshirt with his employer's name. As for being on Pearl Street, he first claimed that he went behind the home to urinate. He later said that he had bought weed from Judd before, that Judd let him into the house through the front door, and that they had talked and smoked in the living room. Smith indicated that Judd had been on the phone with someone else while he was there and that he had seen Judd with his revolver. Smith denied arguing with Judd and killing him. He said he had been there for about an hour and that Judd had let him out the back door.

{¶ 52} There was no DNA evidence directly tying Smith to the murder. However, blood found on the south kitchen wall (by the back door) was matched to Smith, and Smith's DNA was found on a grape Gelato vape pen from the home. Smith's blood was also found in his backpack.

{¶ 53} Construing the evidence in the light most favorable to the State, there was sufficient evidence to prove that Smith had murdered Judd. Surveillance videos, DNA evidence, and Smith's own statements established that he went to Judd's residence on the morning of April 6, 2022, and ultimately left at approximately 11:48 a.m. Judd's brother and fiancée both stopped receiving messages from Judd while Smith was in the home. Smith exited the house by the rear door, a door that Laurin said was typically not used, and the State's evidence established that Smith took several of Judd's belongings with him. There was no evidence that anyone entered or exited the home between Smith's departure and Laurin's arrival around 12:30 p.m. Judd was deceased when

officers responded to Laurin's 911 call, and the jury could have reasonably concluded that Smith had killed him prior to leaving the Pearl Street house.

{¶ 54} Through cross-examination, defense counsel attempted to demonstrate that the police investigation was inadequate and that another person could have committed the murder. There was some evidence, if believed, to support that.

{¶ 55} The video showing movement around Judd's home was motion-activated and there were numerous time gaps, totaling approximately 38 minutes, that were not recorded between 11:48 a.m. and 12:31 p.m. Although Laurin initially said in her 911 call that she did not think Judd was breathing, she later said he was, which could suggest that Judd was shot after Smith had left. Laurin and the police had found a bloody scene, and the fatal shot was a contact wound, but Judd's blood was not found on Smith or his belongings. Additionally, Judd was a drug dealer, and the family identified several individuals who could have been suspects in the murder. The jury heard testimony that detectives had spoken with identified alternative suspects but had eliminated them with brief investigations.

{¶ 56} Although the jury could have found some deficiencies in the State's case, we cannot conclude that the jury lost its way when it believed the State's version of events and found that Smith had shot Judd. The jury's guilty verdicts for aggravated murder and murder were not against the manifest weight of the evidence.

**B. Aggravated Burglary**

{¶ 57} Smith further claims that the State failed to prove that he trespassed in Judd's home for purposes of the aggravated burglary statute. While acknowledging that

a person who is initially invited into a home may become a trespasser if that consent is withdrawn, Smith asserts there was no evidence that Judd had an opportunity to withdraw his consent.

**{¶ 58}** Under the aggravated burglary statute, "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense" if the offender inflicts physical harm or has a deadly weapon. R.C. 2911.11(A)(1) and (2). A trespass occurs when an offender knowingly enters or remains on the premises of another without privilege to do so. R.C. 2911.21(A)(1); *State v. Spells*, 2024-Ohio-6052, ¶ 38 (2d Dist.). "Privilege" means "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

**{¶ 59}** Smith told detectives that, although he was not expected, he was invited into Judd's house, and the evidence suggests that Smith was there with Judd's permission as Judd was speaking with his brother. However, it is irrelevant whether Judd invited Smith to enter the residence. We have repeatedly held that a person who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he or she assaults the victim after gaining entry. *E.g., State v. Debord*, 2023-Ohio-4204, ¶ 51 (2d Dist.); *State v. Trigg*, 2016-Ohio-2752, ¶ 9 (2d Dist.); *State v Perry*, 2015-Ohio-2181, ¶ 29 (2d Dist.). Indeed, we have stated that the privilege to remain terminates immediately upon the beginning of an assault. *See, e.g., State v. Metcalf*, 2012-Ohio-6045, ¶ 20-21 ("any privilege that Metcalf may have had to enter

Johnson's house was revoked or terminated the moment he shot Johnson in the head.").

{¶ 60} Here, Smith became a trespasser the moment he shot Judd in the head, regardless of whether Judd had any opportunity to expressly revoke Smith's privilege to be there. The State presented sufficient evidence that Smith committed aggravated burglary, and the jury's verdict was not against the manifest weight of the evidence.

{¶ 61} Smith's fifth assignment of error is overruled.

### IV. Tampering with Evidence (Count 13)

{¶ 62} In his first assignment of error, Smith claims that Count 13 was unconstitutionally duplicitous because it provided the jury two separate courses of conduct to support the conviction.

{¶ 63} In general, Crim.R. 8(A) permits two or more offenses to be charged in the same indictment "in a separate count for each offense." We have commented that "acts capable of being charged as separate offenses must be charged in separate counts." *State v. Cline*, 2008-Ohio-1866, ¶ 20 (2d Dist.).

{¶ 64} "Duplicity in an indictment is the joinder of two or more separate offenses in a single count." *Parker v. Maxwell*, 174 Ohio St. 471 (1963). "The prohibition against duplicity is geared to protect the accused's Sixth Amendment right to notice of the nature of the charge against him and prevent confusion as to the basis of the verdict." *State v. Smith*, 1978 WL 215411, * 1 (9th Dist. Oct. 4, 1978); *see also, e.g., State v. Fisher*, 2022-Ohio-1363, ¶ 19 (12th Dist.).

{¶ 65} Verdicts in criminal trials must be unanimous. *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) ("the Sixth Amendment's unanimity requirement applies to state and

federal criminal trials equally"); Crim.R. 31(A). However, "jurors need not agree to a single way by which an element is satisfied." *State v. Gardner*, 2008-Ohio-2787, ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817 (1999).

{¶ 66} In determining whether the State has impermissibly interfered with a defendant's right to juror unanimity and the due process right to require that the State prove each element of the offense beyond a reasonable doubt, the critical inquiry is whether the case involves "alternative means" or "multiple acts." *State v. Gardner*, 2008-Ohio-2787, ¶ 48. In an alternative means case, a single offense may be committed in more than one way. *Id*. at ¶ 49. Unanimity is not required as to the means by which the crime was committed, provided that substantial evidence supports each alternative means. *Id*. "In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt." *Id*.

{¶ 67} In contrast, in multiple acts cases, several acts are alleged and any one of them could constitute the crime charged. *Gardner* at ¶ 50. "In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." (Citations omitted.) *Id*.

{¶ 68} In the case before us, Count 13 alleged tampering with evidence in violation of R.C. 2921.12. That statute reads, in part: "(A) No person, knowing that an official

proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation . . ."

{¶ 69} Count 13 stated the elements of tampering with evidence by tracking the language of the statute; no specifics were provided. The State's bill of particulars later clarified that Smith allegedly "removed the firearm used to shoot and ultimately kill Dylan Judd and concealed it from law enforcement impairing its availability as evidence as well as take Dylan Judd's cellphone and smash it and throw it away in the trash dumpster behind CVS."

{¶ 70} During its closing argument, the State urged the jury to find Smith guilty of Count 13 based on both the missing gun and Judd's damaged cell phone. The prosecutor told the jury:

Finally, Count XIII is tampering with evidence. On or about April 6, 2022, County of Montgomery, State of Ohio, this Defendant, knowing that an official investigation was in progress or about to be or likely to be – and likely to be – there's a death, there's a shooting death, there's an investigation likely to occur – did alter, destroy, conceal, or remove anything with purpose to impair its value or availability as evidence in such investigation. And this tampering with evidence, what are we talking about? We're talking about the gun. The gun that was used, that revolver. How it was taken from the scene after it was used, that that would have been evidentiary value that

would have been helpful for this investigation – and also the phone, Dylan Judd's phone that was taken by this Defendant from his house. And we knew he had his phone on him because he was talking to his brother, Travis. He was talking to his fiancé[e], Lauren [sic]. And then we see in that video this Defendant getting off the green bicycle, going across the street behind the CVS. And behind the CVS, what do they find? This smashed cell phone and cell phone case. And you heard from the detective that it took them until March of 2024 to be able to get into that. That it was shattered. That this Defendant had tried to alter or destroy it to impair its value.

Trial Tr. 1277-1278.

**{¶ 71}** Smith did not challenge Count 13 on duplicity grounds in the trial court. Accordingly, our review is limited to plain error.

**{¶ 72}** The State asserts that the missing gun and the damaged cell phone present alternative means by which the jury could have found Smith guilty of tampering with evidence. However, accepting, for the sake of argument, that this case involves alternative means (as opposed to multiple acts), we cannot conclude that the State presented evidence from which the jury could have found *each* means of committing tampering with evidence was proven beyond a reasonable doubt. Specifically, the State failed to present sufficient evidence that Smith tampered with the gun.

**{¶ 73}** The State's case regarding Smith's tampering with the gun consisted of evidence that Judd had a .38 caliber revolver, Judd was shot with a revolver, and the murder weapon was never found. However, a gun's absence from the crime scene

where it has been used does not, without more, support the conclusion that the defendant removed the gun to impair its availability as evidence. *E.g.*, *State v. Like*, 2008-Ohio-1873, ¶ 24 (2d Dist.); *State v. Mabra*, 2015-Ohio-5493, ¶ 26-29 (2d Dist.). In other words, the police officers' inability to find the gun used in a shooting did not, alone, establish that Smith altered, destroyed, concealed, or removed it to prevent its use as evidence.

**{¶ 74}** There was no additional evidence from which the jury could have concluded that the absence of the revolver amounted to tampering with evidence. Based on Smith's text messages to Judd prior to the murder, the jury could have instead concluded that Smith took the gun (along with some of Judd's other possessions) simply because he wanted to have it. Because the State failed to present sufficient evidence on each basis (the gun and the phone) for the tampering with evidence charge in Count 13, we conclude that Smith's conviction for tampering with evidence rises to the level of plain error.

**{¶ 75}** Smith's first assignment of error is sustained.

### V. Imposition of Sentence for Firearm Specification

**{¶ 76}** Smith's third assignment of error claims that the trial court erred in imposing a three-year sentence for the firearm specification in Count 2 when Count 2 was merged into Count 1. He argues that imposition of the sentence constituted double jeopardy and violated his right to due process under the United States and Ohio constitutions.

**{¶ 77}** R.C. 2929.14(B)(1)(g) addresses the imposition of sentence for firearm specifications when an offender has been found guilty of multiple felony offenses (and at least one is a felony listed in the statute) and multiple firearm specifications. It provides:

If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

R.C. 2929.14(B)(1)(g).   The Ohio Supreme Court has interpreted this language to require trial courts to impose prison terms for the two most serious firearm specifications, even when one of the firearm specifications was attached to an offense that was merged at sentencing as an allied offense of similar import.   *State v. Bollar*, 2022-Ohio-4370.

{¶ 78} Smith asserts that R.C. 2929.14(B)(1)(g) violates the double jeopardy protection against imposition of multiple punishments for the same offense.   We recently rejected this argument in *State v. Parks*, 2024-Ohio-5026 (2d Dist.).   In doing so, we noted that the *Bollar* Court briefly addressed double jeopardy, noting that double jeopardy protections are not violated when the legislature specifically authorizes cumulative punishment.   *Parks* at ¶ 90, quoting *Bollar* at ¶ 20.   The supreme court had further concluded that the merger statute (R.C. 2941.25), which implements double jeopardy

protections, "does not override R.C. 2929.14(B)(1)(g), as the latter is the more specific and more recently enacted statute." *Bollar* at ¶ 21. We are bound, as we were in *Parks*, to follow the Ohio Supreme Court's ruling.

**{¶ 79}** Smith's third assignment of error is overruled.

### VI. Ability to Pay Restitution

**{¶ 80}** Smith's fourth assignment of error claims that the trial court failed to consider his present and future ability to pay when it ordered him to pay almost $10,000 in restitution.

**{¶ 81}** R.C. 2929.18(A)(1) permits a trial court to order restitution "by the offender to the victim of the offender's crime . . . in an amount based on the victim's economic loss." If restitution is imposed, the statute states that it may be made "to the victim in open court, to the adult probation department . . . , to the clerk of courts, or to an agency designated by the court." *Id*.

**{¶ 82}** Before imposing restitution, the trial court must consider the offender's present and future ability to pay the amount of the sanction. R.C. 2929.19(B)(5); *State v. Barker*, 2025-Ohio-56, ¶ 47 (2d Dist.). The statute does not identify any specific factors that the trial court must consider when determining the offender's present and future ability to pay; the only requirement is that the court "consider" the offender's present and future ability to pay. *State v. T.O.*, 2025-Ohio-15, ¶ 13 (2d Dist.), citing *State v. Philbeck*, 2015-Ohio-3375, ¶ 27 (2d Dist.). "Although preferable, the trial court is not required to state on the record that it considered an offender's present and future ability to pay so long as there is evidence in the record from which a reviewing court can infer

that the trial court considered the offender's present and future ability to pay prior to imposing restitution." *Id.*, citing *State v. Hull*, 2017-Ohio-7934, ¶ 9-10 (2d Dist.).

{¶ 83} At the beginning of the sentencing hearing, the trial court informed the parties that it had "reviewed the pre-sentence investigation, the sentencing memorandums [sic] from both parties, multiple victim impact statements and attachments thereto, and statements of reports." Trial Tr. 1377.

{¶ 84} According to the presentence investigation report, Smith was 29 years old at sentencing, and he had been incarcerated for more than two years while the charges were pending. Smith reportedly was in good physical health and was not receiving any medication while in the Montgomery County Jail. He described his mental health as "fair," but a competency evaluation on August 15, 2023 found that he was not a mentally ill or intellectually disabled person.

{¶ 85} Smith had completed the 11th grade and, in 2017, had taken classes toward his General Educational Development (GED) diploma. Smith reported attending vocational programming for masonry, painting, and welding at the Job Corp in Georgia in 2012. From 2017 until his arrest on April 7, 2022, Smith worked for Tackett Tree Service. He reported prior employment with three other employers, each lasting a matter of months.

{¶ 86} The trial court was aware that Smith faced life in prison and would not be eligible for parole for 36 years. Smith has three children, but the Montgomery County Child Support Enforcement Agency noted no active support orders. Smith had $710 on his person when he was arrested on these charges.

**{¶ 87}** Based on this record, the trial court had adequate information from which to evaluate Smith's present and future ability to pay, and we can infer that the trial court fulfilled its duty to consider Smith's present and future ability to pay the restitution. We cannot conclude that the trial court abused its discretion when it ordered Smith to pay restitution of approximately $10,000.

**{¶ 88}** Smith's fourth assignment of error is overruled.

### VII. Conclusion

**{¶ 89}** The trial court's judgment will be reversed as to Count 13. In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.